UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | Criminal No. 18-cr-134-2 |
| | : | |
| **SABER FAKIH,** | : | |
| | : | |
| **Defendant.** | : | |

      Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Saber Fakih, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt.

      1. Saber Fakih was born in Kuwait and is a citizen of the United Kingdom. Beginning no later than May 2017, and continuing through at least January 2018, Fakih knowingly and willfully conspired to export over $1 million worth of equipment from the United States to Dubai, with the intent that those items be re-exported to Iran, without having first obtained the required license from the Office of Foreign Assets Control, which is located in the District of Columbia.

      2. Saber Fakih was one of two principal directors of Ipaxiom Solutions, LLC, along with co-defendant Bader Fakih.

      3. In or around May 2017, Alireza Taghavi, an Iranian national, contacted the defendant in the United Kingdom and asked him to assist Taghavi in procuring an Industrial Microwave System (IMS) from a company in the United States, which is referred to as the Massachusetts Company in the Indictment. The defendant agreed to help Taghavi, in exchange for a commission of approximately $15,000 United States Dollars (USD).

      4. During conversations between the defendant and Taghavi, which often occurred via an Internet-based voice calling application, Taghavi informed the defendant that Taghavi could not purchase the IMS directly because Taghavi was an Iranian national.

      5. Saber Fakih was the primary liaison between Taghavi and the Massachusetts Company. During his correspondence with the Massachusetts Company, Saber Fakih never revealed his affiliation with Taghavi, nor that the IMS was destined for Iran.

      6. On or about June 5, 2017, Saber Fakih placed a bid with the Massachusetts Company in to purchase the IMS in the amount of $400,800 USD. Saber Fakih forwarded an email to Taghavi, confirming that the bid was placed, on the same day.

      7. On July 23, 2017, the defendant received an email from Taghavi, which contained a purchase and sale agreement for the IMS dated July 22, 2017, which listed the buyer as "Jalal Nejad" (whose true name is Jalal Rohollahnejad), with an address in Tehran, Iran. The defendant was listed as the salesperson, and the agreement required Rohollahnejad to deposit $450,000 into Altaf Faquih's account in the United Arab Emirates. The $450,000 price included, according to the agreement, "the price of equipment, Export and Shipping costs from USA to Dubai, Clearance and Re-export charges from Dubai to Iran and all insurance costs." The defendant forwarded this email to Bader Fakih and Altaf Faquih.

      8. On September 5, 2017 the defendant emailed Taghavi, which confirmed that on August 28, 2017, Altaf Faquih received the equivalent of $450,000 USD in Emirati currency from Rohollahnejad. The money was transferred from Faquih, in the United Arab Emirates, to Bader Fakih in Canada, via three separate USD wire transfers that transited banks located in the United States. On September 8, 2017, Bader Fakih transferred $395,454 USD from a bank controlled

by him in Canada to a bank located within the United States and controlled by the Massachusetts Company. On October 5, 2017, Saber Fakih sent Taghavi two photographs of the receipt for the aforementioned wire transfer from Bader Fakih to the Massachusetts Company, which Taghavi forwarded to Rohollahnejad.

9. On October 16, 2017, the day before the IMS was scheduled to be exported from the United States, Saber Fakih emailed Taghavi and others, stating that he "urgently need[ed] the details of the shipping company." A co-conspirator instructed Saber Fakih to list a company in Dubai on the bill of lading. The IMS was not in fact exported as originally scheduled on October 17, 2017.

10. In October 2017, Saber Fakih, upon instructions provided by his co-conspirators (including Taghavi) told the Massachusetts Company that a company in Dubai would be the end user of the IMS. At the time Saber Fakih made those representations to the Massachusetts Company, he knew that the IMS in fact had an ultimate end destination in Iran.

11. On October 30, 2017, Saber Fakih sent an email to Altaf Faquih and Alireza Taghavi, which included a Shipper's Letter of Instructions falsely listing the "ultimate consignee" for the IMS as residing in the United Arab Emirates.

12. On November 15, 2017, based on the information provided to the Massachusetts Company by Saber Fakih, a logistics company within the United States filed an "Electronic Export Information" document with the United States Customs and Border Protection (CBP) that listed a company in Dubai as the "ultimate consignee" for the IMS.

13. On or about November 21, 2017, the IMS arrived at the Port of Newark in New Jersey for export. Unknown to the defendant or his co-conspirators at that time, it was detained by CBP. The defendant learned that the IMS had been detained on or about December 24, 2017.

14. Between December 24, 2017 and August 2018, the defendant regularly contacted the Massachusetts Company and the U.S. freight forwarder, advising that the end customer wanted more details about why the IMS was being held by U.S. customs.

15. On or about January 29, 2018, Saber Fakih received a report authored by Taghavi, for delivery to Rohollahnejad, explaining the fact that the IMS had been seized by the U.S. Government. Saber Fakih updated the report with images of IMS, and on the instructions of Taghavi also added statements with regards to money laundering. He then sent it back to Taghavi for delivery to Rohollahnejad. The report stated that the funds for the IMS were transferred from Dubai to Canada in a way "to overcome money laundering issues," and that it was instructed that the money should be sent to Altaf Faquih in Dubai "since the customer in Iran could not send money directly to the US." Prior to sending the report back to Taghavi, Saber Fakih reviewed it, and he agreed that it was accurate to the best of his knowledge.

16. Saber Fakih was also involved in negotiations to procure two U.S-origin Counter-Drone Systems (CDS) from a company referred to in the indictment as the Maryland Company.

17. In May 2017, Saber and Bader Fakih began negotiations with the Maryland Company for the purchase of a CDS, stating that they would be for a customer in the United Arab Emirates. In fact, the defendant and Bader Fakih hoped to acquire the CDS on behalf of Taghavi.

18. On August 3, 2017, Saber Fakih sent an email to Taghavi with a pro-forma invoice for the CDS. In the email, Saber Fakih requested an "agent fee" of $20,000 because "the company in Canada [Ipaxiom] is taking a huge risk with" the CDS.

19. On September 12, 2017, Saber Fakih sent an email to Taghavi and attached a commercial quote for two CDS units totaling approximately $1 million USD.

20. On April 10, 2018, after funding had not been forthcoming for the CDS for some months and after the IMS had been seized, Rohollahnejad sent an email to Saber Fakih stating, "I remember [Taghavi] told we can start some other business in oil and Gas field to cover some penalties of the microwave oven project, I have some relations in Iran government can support us, also if you can buy [CDS], I have customer for it too."

21. Beginning in or around July, 2017, Fakih knew that the IMS was destined for Iran. At all times relevant to the charges in this case, Fakih knew that it was illegal to export U.S.-origin goods from the United States to Iran, or to re-export U.S.-origin goods from a third country to Iran.

22. At no point did Fakih or his co-conspirators seek or obtain a license from the Office of Foreign Assets Control, which is located in Washington, D.C., to allow them to ship any U.S.-origin goods to Iran.

                                            Respectfully submitted,
                                            MATTHEW M. GRAVES
                                            United States Attorney
                                            DC Bar No. 481052

By:    /s/ *Erik M. Kenerson*
          Erik Kenerson // Assistant United States Attorney
          Ohio Bar No. 82960
          555 Fourth Street, N.W., Room 11-909
          Washington, DC 20530
          Erik.Kenerson@usdoj.gov
          (202) 252-7201

## DEFENDANT'S ACKNOWLEDGMENT

       The preceding statement is a summary made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. I make this statement knowingly and voluntarily, and I stipulate and agree that this Statement of Offense concerning my actions is true and accurate. I have read every page of this Statement of Offense and have discussed it with my attorney, Jeffrey Kolansky. I am fully satisfied with the legal services provided to me in connection with this plea. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

Date: 19/01/2022

                                            Saber Fakih
                                            Defendant

## ATTORNEY'S ACKNOWLEDGMENT

       I have read this Statement of Offense and have reviewed it fully with my client, Saber Fakih. I concur in my client's desire to adopt and stipulate to this Statement of Offense as true and accurate.

Date: 1/19/22

*Jeffrey Kolansky*
Attorney for Saber Fakih

p 4 of 4
Statement of Facts