UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | |
| | : | |
| SABER FAKIH, | : | CRIMINAL NO. 18-134-2 (DLF) |
| | : | |
| | : | |
| Defendant. | : | |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully submits its Memorandum in Aid of Sentencing. The government recommends, as explained both below and in the sealed supplemental memorandum submitted herewith, that Saber Fakih (hereinafter "Saber Fakih" or "Defendant"), be sentenced to a term of imprisonment that comports with the U.S. Sentencing Guidelines and the factors delineated in 18 U.S.C. § 3553(a), for his involvement a conspiracy to illicitly export complex U.S. origin goods, which have both military and civilian uses, from the United States to Iran.

### Factual and Procedural Background

On May 9, 2018, Defendant Saber Fakih and others were charged via indictment with three criminal charges: (Count One) Conspiracy (1) to export U.S. Goods to Iran and Provide Services to a SDN and (2) to defraud the United States, in violation of 18 U.S.C. § 371; 50 U.S.C. § 1705 and 31 C.F.R. §§ 560.203 through 560.205 and 594.204 and 594.205; (Count Two) Unlawful Exports and Attempted Exports to an Embargoed Country and Provision of Services to a SDN, 50 U.S.C. § 1702 and 1705 and 31 C.F.R. §§ 560.203 through 560.205 and 594.204 and 594.205; (Count Three); (Count Three): Conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h).

1

As set forth in the Indictment, and as the defendant agreed in the Statement of Offense, Fakih engaged in a complex, months-long scheme to illegally export U.S.-origin industrial microwave system (IMS) to Iran, and also explored the export of a sophisticated counter-drone system (CDS), for ultimate delivery to Iran.  Each of these items has significant military uses.

Employees of Lawrence Livermore National Laboratory have analyzed the photos and specifications of the IMS that the defendant helped export, and determined that, with the addition of a commercially available antenna, it "can be used for offensive military purposes for a high-power microwave (HPM) based directed-energy weapon (DEW) system. The multiple outputs in the side of the trailer depicted in one of these photos suggests the potential to direct outgoing energy in multiple directions, potentially against multiple targets." *See* Exhibit 1, Review of Microwave-Generating System Photos and Specifications, dated April 25, 2018.  While this sophisticated device can also dry and heat food like a regular microwave, common sense indicates that this was not the use intended by the procurement agents of a sanctioned entity who paid $450,000 for the device.

Fakih's co-conspirators held themselves out as procurement agents of Rayan Roshd, which has since been sanctioned by the U.S. Government for its procurement activities related to the Iranian Revolutionary Guards Corps (IRGC).  *See* Indictment, ¶¶ 5, 6, 19, 20.  Since the indictment was returned in this case, the IRGC has been designated as a foreign terrorist organization, and at all times relevant to the conspiracy, Iran has been designated by the U.S. Government as a state sponsor of terrorism.

Saber Fakih played an instrumental role in the conspiracy and attempt to export U.S.-origin goods to Iran. Defendant communicated directly with both co-defendant Alireza Taghavi, the Iranian national who procured the IMS on behalf of SDN Rayan Roshd and Iran, and with the Massachusetts Company who sold the IMS.  Despite knowing that the IMS was ultimately destined for both an

Iranian national and, no later than July 2017, to Iran itself, the defendant did not inform the Massachusetts Company of the true end destination for the IMS.

As the defendant admitted in his statement of offense, he was the primary liaison between the Iranian purchaser and the U.S.-based seller of the IMS—Saber Fakih placed a bid with the Massachusetts Company, coordinated an inspection of the machine, and generally corresponded with the seller on Taghavi's behalf.  Statement of Offense, ¶ 5.

The defendant executed a contract with a total price of $450,000 USD with co-conspirator Taghavi in July 2017 that specifically contemplated "the price of equipment, Export, and Shipping costs from USA to Dubai, Clearance and Re-export charges from Dubai to Iran and all insurance costs."  *Id.*, ¶ 7.  The purchase and sale agreement included a "force majeure" clause that indicated that neither party would be in breach of contract in the event of an embargo.  *See* Indictment, ¶ 24, Overt Act 9; Ex. 2 at 6.  Approximately a week later, Saber Fakih emailed Taghavi a copy of a proposed consultant agreement.  The electronic title of the document was "Service Agreement_Iran_Consultant.docx." Ex. 3.

On September 5, 2017, after co-conspirator Jalal Rohollahnejad agreed to have the purchase price paid to another Dubai-based co-conspirator in Emirati currency, Saber Fakih sent a letter acknowledging receipt to Taghavi, and he informed Taghavi that the money was being "gradually delivered to" the Massachusetts Company.  Statement of Offense ¶ 8; Ex. 4 at 3.  Months later, after the IMS was detained by U.S. customs, the defendant acknowledged that the money was being delivered in this fashion to "overcome money laundering issues."  Statement of Offense ¶ 15.

The defendant's scheme caused false information about the export of the IMS to be filed with a U.S. customs agency.  On October 16, 2017, the day before the planned export date for the IMS approached, Saber Fakih received from a conspirator the name of a purported (but false) end-user for

3

the IMS in Dubai. *Id.*, ¶ 9. Despite knowing that the IMS was destined for Iran, Fakih provided this fraudulent end-user information to the Massachusetts Company, which caused (among other things) a U.S. logistics company to file a false Electronic Export Information document with U.S. Customs and Border Protection. *Id.*, ¶ 12.

When the IMS came to port to be exported on November 15, 2017, it was seized by U.S. Customs and Border Protection. *Id.*, ¶ 13. After the seizure of the IMS became known, Saber Fakih sent multiple inquiries to the Massachusetts Company on behalf of Taghavi inquiring why the IMS had been detained. *Id.*, ¶ 14. Fakih knew at the time of these inquiries that the IMS was in fact destined for Iran.

While the defendant's scheme to illegally export the IMS was ongoing, he also attempted to procure a contract worth over $ 1million to deliver two counter-drone systems from a Maryland-based company to Iran. The Maryland manufacturer highlights that this high-tech system "is designed for both commercial and defense/security organizations to deal with the emerging threat of autonomous systems." In the defendant's email to Taghavi with the quote for two units of the CDS, he demanded an agent fee of $20,000 because his company was taking a "huge risk" with the CDS. Statement of Offense, ¶ 18.

The negotiations for the sale of the CDS were ongoing at the same time that the defendant was attempting to export the IMS. Just as he did with the CDS, co-conspirator Taghavi was forwarding his correspondence with Saber Fakih to Jalal Rohollahnejad, who holds himself out as a procurement agent for Rayan Roshd. Email correspondence establishes that the IMS was originally scheduled to be exported in or around October 2017, while co-conspirator Bader Fakih informed the Maryland company he had received "verbal go-ahead" to purchase the CDS around the same time. Ultimately, after Saber Fakih proved unable to successfully export the IMS, no

4

money was forthcoming for the CDS.

The defendant was arrested in the United Kingdom pursuant to a U.S. Extradition Request on or about February 10, 2021. Shortly thereafter, the defendant retained legal representation in the United States. Through that counsel, the defendant offered to consent to extradition in the United Kingdom, which had the effect of sparing the governments of both the United States and United Kingdom the uncertainty and expense of a contested extradition proceeding. On or about May 19, 2021, defendant notified the U.K. court that he would be consenting to his extradition to the United States, and he formally consented to that extradition before an English court on or about June 1, 2021. Saber Fakih made his first appearance before Magistrate Judge Robin M. Meriweather on August 5, 2021, and on January 25, 2022, he entered a plea of guilty to Count 2 of the Indictment before this Court.

## Statutory Penalties

FAKIH faces a maximum penalty of not more than 20 years of imprisonment or a maximum fine of $1,000,000 or both, upon his conviction for a violation of 50 U.S.C. § 1705.

## Sentencing Guidelines Calculation

The Probation Office found no U.S. convictions. PSR ¶¶ 53-54. The government is also not aware of any convictions, which results in a criminal history score of zero. FAKIH's criminal history score of zero establishes a criminal history category of I. The parties agree that under the United States Sentencing Guidelines (U.S.S.G.), his base offense level is 26. ECF 25 at 2-3; U.S.S.G. § 2M5.1(a)(1). The government moreover agrees that the defendant should receive a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. The defendant's Total Offense Level is thus 23 under the plea agreement.[1] The Guideline range for an

---

[1] The PSR and the plea agreement were both entered prior to the promulgation of the 2023

offense with a Total Offense Level of 23 and criminal history category I is 46 to 57 months of incarceration, with an applicable fine range of $20,000 to $200,000.

## Evaluation of the Section 3553(a) Factors

### I.     Legal Standards

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court ruled that the United States Sentencing Guidelines are no longer mandatory. However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," *Kimbrough v. United States*, 552 U.S. 85, 92 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" id. at 574 (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). The Supreme Court "accordingly recognized that, in the

---

edition of the U.S. Sentencing Guidelines, which now includes Section 4C1.1, which provides for a possible two-level Guidelines reduction for defendants with no status or criminal history points. The government agrees with Probation that based on currently available information, it does not appear that the defendant has any criminal history.  Thus the defendant *may* be eligible for this reduction if he meets all of the criteria in U.S.S.G. § 4C1.1(a)(2)-(9).  The burden is on the defendant to demonstrate that he qualifies to any reduction under § 4C1.1.

Because this sentencing is taking place after the 2023 version of the Guidelines was promulgated, the Court should determine whether the defendant has satisfied his burden to demonstrate eligibility for the reduction by satisfying all the criterial laid out in U.S.S.G. § 4C1.1(a).  If the defendant satisfies his burden and the Court finds that the provision applies, the defendant's total offense level would be reduced to 21, which corresponds with a Guidelines range of 37 to 46 months.  Should the Court impose a fine, the fine range at Guidelines level 21 is $15,000 to $150,000.

ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 109 (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)). As one member of this Court has held, "Booker requires judges to engage in a two-step analysis to determine a reasonable sentence." *United States v. Doe*, 413 F. Supp.2d 87, 90 (D.D.C. 2006) (Bates, J.)

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing sentence. *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives – that is, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care. See 18 U.S.C. § 3553(a)(1) and (2). In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

**II.     An Analysis of the Factors Enunciated in 18 U.S.C. § 3553(a) Demonstrates that Substantial Sentences within the Applicable Guidelines are Appropriate**

As discussed in detail below, an analysis of the factors enunciated to 18 U.S.C. § 3553(a) demonstrates that the imposition of a substantial sentence on the defendant, based on the applicable Guidelines, would be appropriate, in the absence of the information outlined in the sealed supplemental memorandum.

A.      **The Nature and Circumstances of the Offense**

The Sentencing Commission has reflected the seriousness of a violation of IEEPA when the goods are destined for Iran by assigning a high base offense level of 26 to all export offenses that evade national security controls. U.S.S.G. § 2M5.1(a)(1)(A). The Iranian embargo was imposed pursuant to IEEPA's authorization of the President "to deal with any unusual and extraordinary threat . . . to the national security." 50 U.S.C. § 1701. The Executive Order imposing the embargo specifically found that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security . . . of the United States." Executive Order No. 12,957. The defendant's actions thus unequivocally constitute an offense involving the national security of the United States, which the Guidelines rightly treat very seriously. *See United States v. McKeeve*, 131 F.3d 1, 14 (1st Cir. 1997) (holding that goods exported in violation of then-existing Libyan embargo qualified for the national-security enhancement regardless of whether the specific goods at issue implicate national security interests). The offense, moreover, involved a financial transaction with a country supporting international terrorism, which the Guidelines also take very seriously. U.S.S.G. § 2M5.1(a)(1)(B).

This defendant's conduct was particularly serious, with potentially dangerous consequences. Sending an industrial microwave System that can be modified for offensive weapon use with the simple addition of a commercially available antenna unquestionably implicates national security. There is no telling what Iran could do or facilitate with the microwave if it wished to harm to U.S. interests abroad. The defendant's efforts to export this dangerous machinery, which would have ended with it in the hands of representatives of the Rayan Roshd, a group now sanctioned for procuring for the IRGC – a designated Foreign Terrorist Organization – almost succeeded. The IMS made it all the way to port, destined to Iran with defendant Fakih's

knowledge.  Thankfully, law enforcement was able to alert Customs and Border Protection of the sale before it actually left the port, and the conspiracy was thwarted.[2]

The clear purpose of the defendant's role within the conspiracy was to facilitate the illicit shipment U.S.-origin goods to Iran.  In the statement of offense, the defendant admitted to being the primary liaison between co-conspirator Taghavi and the Massachusetts Company.  Statement of Offense, ¶ 5.  Fakih learned early on that Taghavi could not acquire the IMS himself because he was an Iranian national, and he learned no later than July 2017, some four months before the IMS was delivered to port, that it was destined for Iran.  *Id.*, ¶¶ 4, 21.

This offense was not a mistake. It was performed with full knowledge of the illegality of the conduct. Indeed, the defendant knew, at all times relevant to the conspiracy, that it was illegal to export or re-export U.S.-origin goods to Iran. *Id.*  He received numerous direct indications that Iran was precisely where the IMS was headed.  In July, he received a purchase and sale agreement that listed the buyer as co-conspirator Rohollahnejad at an address in Tehran, Iran, and that specifically listed re-export costs from Dubai to Iran as part of the contract.  *Id.*, ¶ 7.  Fakih then affirmatively misled the Massachusetts Company about the name and location of the end user for the IMS, which caused a U.S. freight forwarder to file an export document with Customs and Border Protection that contained false information about the end user.  *Id.*, ¶¶ 10, 12.

The government agrees with the Presentence Report that neither an aggravating nor a mitigating role adjustment applies to the defendant's conduct in the conspiracy.  *See* PSR ¶ 37.  The defendant did, however, play an integral role, negotiating with the U.S. Company on behalf of the Iranian purchaser who could not do so directly.  He also relayed false information to the

---

[2]     As detailed above, the timing suggests that the money for the CDS was only not forthcoming from Iran as a result of the fact that the defendant was unsuccessful in delivering the IMS to Iran.

seller in an attempt to hide the true destination of the IMS. His role was not minor. He also was neither a leader nor a manager, and the government acknowledges that it possesses no evidence that this defendant knew that the IMS could be modified to be used offensively, nor of his Iranian co-defendants' connection to a sanctioned entity. Thus, the aggravating role enhancements do not apply. The defendant's conduct nonetheless posed a significant risk to U.S. national security: the defendant facilitated the export of sophisticated U.S.-origin goods to a state sponsor of terrorism, in knowing violation of an embargo against that country. The Guidelines rightly treat that conduct as a serious offense, even for a first-time offender whose conduct did not warrant a role enhancement.

Against this record, nothing in the nature and circumstances of the offense at issue gives reason to depart or vary from the established Guideline range. Significant sentences are necessary to emphasize the importance of export controls in contributing to the national defense, especially when such exportation involves sophisticated machinery capable of military uses.

**B.      The History and Characteristics of the Offender**

The defendant's willful and deliberate violation of export laws resulted in his conviction. He was aware of his illicit conduct and knew what he was doing was illegal. Accordingly, given the IMS and CDS systems—both in dollars and to representatives of Rayan Roshd, who were willing to pay nearly $450,000 for the IMS and were considering over $1 million for the CDS, the defendant should be held accountable for his willful conduct and disregard for the export laws.

The defendant has, however, accepted responsibility for his actions and spared the government the risk and expense of a trial. He gave early notice of his intention to plead guilty. Those factors weigh in his favor. The government additionally acknowledges that the defendant consented to extradition in the United Kingdom, thus saving both the United States and United

Kingdom the expense and uncertainty of a contested extradition hearing. The defendant has been compliant with his conditions of release since he arrived in the United States in 2021, which have involved him living on home confinement at a hotel in Philadelphia, Pennsylvania, away from his family. The Court should take the defendant's home confinement and compliance with that condition of release into account in fashioning a sentence, but he should not get credit for time served as if he were incarcerated.

### C. The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public

A sentence within the applicable Guidelines range can have a real deterrent effect and serve as a true warning to anyone tempted to ignore the export laws. Export violations, particularly those with national security implications are – as Congress, the President, and the Guidelines intended them to be – grave matters that warrant real punishment. That punishment would be warranted here, but for the information contained in the supplemental memorandum.

### D. The Need to Provide the Defendant with Educational or Vocational Training

The defendant has not requested nor demonstrated a need for such training. In any event, the other factors bearing on the seriousness of the offense and the need for strong deterrence outweigh this element in fashioning a just sentence.

### E. The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

The starting point in the Court's analysis under § 3553(a)(6) should be the sentences of "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). While sentences in IEEPA cases may vary greatly, the Court's analysis should begin with sentences imposed on similarly situated defendants, *i.e.*, defendants who have been sentenced

in connection with cases involving the illicit export of goods to Iran with the potential for military use.

In various cases around the country of similar nature, as in involving dual-use goods, have resulted in a wide range of sentences from probationary sentences to over 5 years imprisonment (and even higher for military related goods). These ranges have been largely dependent on factors such as cases involving substantial assistance to the government to significantly differing factual backgrounds of the cases and the nature goods involved. The Guidelines range in this case falls squarely within that wide range. We highlight some sentences similar to the Guidelines range in this case below: *United States v. Lim Kow Seng*, et. al., Case No. 10-174 (EGS) (D.D.C. 2013, 2017), sentences of imprisonment of 37, 34, and 40 months; *United States. v. Khadeni*, Case No. 12-CR-278-RMC-1 (D.D.C. 2013), imprisonment of 29 months; *United States v. Ghasempour*, No. 18-CR-80 (W.D. Wa. 2018); *United States v. Kuyumcu*, No. 16-CR-308 (DLI) (E.D.N.Y. 2017), imprisonment of 57 months; *United States. v. Tally* (M.D. Fla. 2013), imprisonment of 30 months; *United States v. Vashari* (E.D. Pa. 2011), imprisonment of 33 months; and *United States v. Echeverri*, No. 11-CR-60052-AJ (S.D. Fla. 2011), imprisonment of 24 month. We highlight these cases solely to demonstrate that the Guidelines range is within the general range of sentences imposed by Courts across the country, *i.e.*, that a sentence within that range would not result in an unwarranted disparity.

Accordingly, the Court should impose a sentence of incarceration on the defendant, relying on the Sentencing Guidelines as a benchmark for such sentencing calculations, consistent with the cases involving similarly situated defendants.

**Conclusion**

WHEREFORE, the government respectfully recommends that the defendant be sentenced to a term of imprisonment, as further detailed in the sealed supplemental memorandum that we are submitting herewith, to reflect the seriousness of her conduct of conspiring to export sophisticated technology with potential military uses to a state sponsor of terrorism, and to deter others who would attempt to engage in similar conduct.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:  */s/ Erik M. Kenerson*
ERIK M. KENERSON, OH Bar No. 82960
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7201 //
Erik.Kenerson@usdoj.gov