<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

</div>

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 18-cr-134-2 |
| | : | |
| SABER FAKIH | : | **SEALED** |
| | : | |
| Defendant | : | |
| | : | |

<div align="center">

**DEFENDANT SABER FAKIH'S SENTENCING MEMORANDUM**

</div>

**I.     INTRODUCTION**

Defendant, Saber Fakih, by and through his counsel, respectfully submits that, pursuant to 18 U.S.C. § 3553(a) and United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), a sentence significantly below the range suggested by the United States Sentencing Guidelines (the "Guidelines") is manifestly appropriate, particularly in light of the recent amendments to the Guidelines which clearly articulate a policy of avoiding disproportionately harsh sentencing outcomes for defendants like Mr. Fakih with no criminal history, as well as his ████████████████████████████████, his otherwise unimpeachable character, the enormous burden on his medically compromised wife and their children due to his absence, and the unavoidably ███████████████████, if incarcerated.

As reflected by his plea agreement (the "Plea Agreement"), Mr. Fakih admits that he has made a terrible mistake – without malice towards the United States or, indeed, anyone, but a mistake nonetheless – and **has accepted responsibility for <u>that intentional act</u>** which led to these charges.  As the consequences of his act are already accruing, and in light of the totality of the circumstances, it is clear that no good purpose would be served by imposing a sentence even remotely within the Guidelines range.  Relevant facts include: Mr. Fakih's waiving an extradition hearing, ████████████████████████████████,  ████████████

███████████████████████████████; ██████████████████████████████████

████████████████████████ and, accordingly, his ████████████████████████,

particularly in a correctional facility; his otherwise law-abiding background and good character;

the circumstances in which he made this mistake/committed the act, including his belief that the

industrial microwave equipment in question was for use in the food industry, and his lack of

knowledge either that, initially, the equipment was ultimately intended by the end buyer to be

shipped to Iran, or that any of the persons or entities involved were specifically subject to

sanctions; his status as a deportable alien, which puts him at risk of disparate treatment during

incarceration; and the impact of his prosecution on his ability to care for his family—including not

only the devastating impact on his already limited economic prospects but also the inability to care

for his wife, ███████████████████████████████████████████████

████████████████████████████ that has fallen on their children, who have had

their educations and their life plans significantly disrupted as a result of his actions.

It is precisely for circumstances such as those presented in this case, involving a first-time,

non-violent offense by a person of good character, with every motivation to avoid anything even

approaching illegal behavior in the future so as to remain with his family—and at high risk of

severe illness in incarceration—that § 3553(a) and Booker counsel against the mechanistic

application of the Guidelines.  And, indeed, the Guidelines were amended, effective November 1

2023, not only to further reduce the recommended sentencing calculation for defendants like Mr.

Fakih with zero criminal history points ("zero-point offenders"), but also, pursuant to amendments

made in accordance with the 2023 Criminal History Amendment, to expressly take into account

the hardship that will fall on a defendant's family members, permitting a defendant to petition for

a reduction in sentence due to factors including those presented in Mr. Fakih's case.  For these

reasons, and as set forth in further detail below, it is respectfully submitted that a term of probation is appropriate and will accomplish the purposes of sentencing and that, furthermore, a sentence of probation can and should be served in Mr. Fakih's home country, the United Kingdom, pursuant to 18 USC § 3563 as well as a multilateral convention to which the United States is a party and its implementing statutory provisions.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

On January 19, 2022, Mr. Fakih pleaded guilty to Count 2 of the Indictment, which charged him with violating the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705, and its implementing regulations, 31 C.F.R. §§ 560.203 – 560.205 and §§ 594.204 – 594.205.  (D.E. 19, at 1.)

Prior to entering into the Plea Agreement, Mr. Fakih, after being on home detention for approximately 6 months in the U.K., waived an extradition hearing, pursuant to an agreement with the U.S. Attorney's Office for the District of the District of Columbia ███████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████.  Thereafter, Mr. Fakih voluntarily entered the United States on August 5, 2021, to answer to the Indictment.  Upon entry into the U.S., Mr. Fakih was arrested and after a hearing, was immediately released on personal recognizance, subject to a curfew and electronic location monitoring as set forth in the Court's August 5, 2021 Order Setting Conditions of Release.  Since his arrest and release, Mr. Fakih has been staying alone █████████████████████ ████████████████████████████████████████████It is important to note that in the almost 30 months (2 ½ years) during which Mr. Fakih has been on release to a small hotel room, with no family or friends, he has been entirely compliant with all conditions of release pending sentencing.

## III.    OBJECTIONS TO MARCH 7, 2022 DRAFT PRESENTENCE INVESTIGATION REPORT

On March 7, 2022, the draft Presentence Investigation Report (the "March 7 PIR") was issued.  On March 21, 2022, pursuant to Rule 32(f) of the Federal Rules of Criminal Procedure, Mr. Fakih presented his objections to the March 7 PIR.  A copy of the objections is attached as Exhibit "A."  In brief, Mr. Fakih has objected to and seeks to correct the following:

<u>Release Status:</u>  The March 7 PIR is unclear and/or incomplete insofar as it states only that Mr. Fakih ██████████████████████████████████  As noted above Mr. Fakih waived an extradition hearing and voluntarily entered the United States, ████████ ████████████████████████████████████████████████████████████████ ██████████████

<u>Entities Allegedly Involved:</u>  The March 7 PIR incorrectly and/or ambiguously refers to ████████████████████████████████████████████████████████████████ ██████████████████████████  To clarify, Mr. Fakih was ██████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████.

<u>Assets:</u>  The March 7 PIR incorrectly overvalued a vehicle; based on a valuation service in the United Kingdom, where the vehicle is located, the vehicle is worth approximately US$6,000 less than what the March 7 PIR states, (in addition to the normal loss of value due to the passing of time since the March 7 PIR was issued.)

<u>Inability to Pay Fine:</u>  While the March 7 PIR acknowledges that "it does not appear the defendant has the ability to pay a fine in this case" (March 7 PIR, ████ it nevertheless fails to provide relevant citations and discussions to the statute (18 U.S.C. § 3572(a)(1), (2)) and Guidelines provisions (U.S.S.G. § 5E1.2(a)) which weigh conclusively against the imposition of a fine on Mr. Fakih, due to his inability to pay.

<u>Personal and Family Data:</u>  The March 7 PIR omits many important details regarding the

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

<u>Role Assessment:</u>  The March 7 PIR erroneously includes information pertaining to uncharged conduct that is irrelevant to the offense to which he pleaded guilty.

<u>Factors Warranting Variance:</u>  The March 7 PIR omits and ignores factors which support significant downward variance from the Guidelines sentencing range pursuant to § 3553(a). The factors supporting downward variance are also examined in detail below.

While Mr. Fakih therefore disputes the accuracy and completeness of the March 7 PIR, as noted above, to the extent that certain facts set forth therein are otherwise not being disputed, the March 7 PIR will be cited herein.

## IV.    LEGAL ARGUMENT

Since <u>Booker</u> was decided by the United States Supreme Court in 2005, the Guidelines have been only an advisory, rather than a mandatory, authority.  <u>See</u> 543 U.S. at 224.  Thus, while "district courts must still give 'respectful consideration' to the now-advisory Guidelines (and their accompanying policy statements) … a district court may in appropriate cases impose a non-Guidelines sentence…." <u>Pepper v. United States</u>, 562 U.S. 476, 501, 131 S.Ct. 1229, 1247 (2011) (quoting and citing <u>Kimbrough v. United States</u>, 552 U.S. 85, 101, 109-110, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007).  Furthermore, there is **no** requirement of "'extraordinary' circumstances to justify a sentence outside the Guidelines range." <u>Gall v. U.S.</u>, 128 S.Ct. 586, 595, 552 U.S. 38, 47 (2007).

As set forth in his Plea Agreement, Mr. Fakih agreed that, under the Guidelines, the applicable offense level was 23.  While, as set forth above, Mr. Fakih has disputed the accuracy of certain statements set forth in the March 7 PIR, he does not dispute the Presentence Investigation Report's offense level calculation at that time under the Guidelines, which was also 23.

However, effective November 1, 2023, the Guidelines were amended in such a way as to reduce the offense level applicable to Mr. Fakih.  Pursuant to the 2023 Criminal History Amendment (also known as Amendment 821), provisions were added to the Guidelines under a new section, § 4C1.1, to decrease the otherwise applicable offense level for certain "zero-point offenders," *i.e.*, those with no prior criminal history.  As the Sentencing Commission explained in its commentary, § 4C1.1 "was informed by its studies of recidivism among federal offenders, as well as other extensive data analyses of offenders with no criminal history points, and public comment," where it was shown that "offenders with zero criminal history points have considerably lower recidivism rates than other offenders" and were more frequently sentenced below Guidelines ranges.  USSG § 4C1.1, comment (background).  Accordingly, "[t]he Commission determined that

the departure and variance rates for zero-point offenders, coupled with its recidivism data, warranted action," id., resulting in the implementation of § 4C1.1, which provides as follows:

§4C1.1. Adjustment for Certain Zero-Point Offenders

(a) Adjustment- if the defendant meets all of the following criteria:

(1) the defendant did not receive any criminal history points from Chapter Four, Part A;

(2) the defendant did not receive an adjustment under §3A1.4 (Terrorism);

(3) the defendant did not use violence or credible threats of violence in connection with the offense;

(4) the offense did not result in death or serious bodily injury;

(5) the instant offense of conviction is not a sex offense;

(6) the defendant did not personally cause substantial financial hardship;

(7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);

(9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and

(10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;

decrease the offense level determined under Chapters Two and Three by 2 levels.

As Mr. Fakih meets all of the enumerated criteria in § 4C1.1, the offense level applicable to him should accordingly be decreased by two levels, from 23 to 21.

Furthermore, Mr. Fakih respectfully submits that even in light of the decreased applicable offense level under § 4C1.1 – or, indeed, because of the policy reasons underlying § 4C1.1 as well as an amendment to another Guidelines provision, §1B1.13(b), permitting reductions in sentencing based on factors such as those presented here – his is a paradigmatic case for variance from the Guidelines.  Based on the § 3553(a) factors, individually and cumulatively, significant downward variance is justified.

**A.**   **Sec. 3553(a)(1):** ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

         ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

**B.**      **Fakih** ████████████████████████████████████
         ████████████████████████████████

Any length of imprisonment, much less a substantial one, would be contrary to the purposes of sentencing to impose a just, proportional punishment that is consonant with fundamental humanitarian considerations, given that Mr. Fakih ████████████████████████████████████████████

██████████████████████████████████████████████████

at a correctional facility.

Mr. Fakih is ██████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████

    In light of Mr. Fakih's ████████████████████████████

██████████████████████████████.  In cases involving defendants imprisoned before the

COVID-19 pandemic on serious charges for arguably, much worse offending behavior than is at

issue here, and ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████.  As such, the court found "extraordinary

and  compelling  reasons"  for  the  defendant's  release,  considering  the  § 3553(a)  factors  (as

incorporated by reference in the statute authorizing modification of the term of imprisonment, 18

U.S.C. § 3582(c)(1)(A)(i).  Similarly, ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████

      While, strictly speaking, ████████████████████████████████

███████████████████████, (although his movement and freedom have been highly restricted

for close to 3 years), the same underlying rationale for the outcomes of those cases applies here.

Indeed, the rationale is even stronger here, as there is no requirement that a variance from the

Guidelines be based on "extraordinary" circumstances, ████████████████████████

██████████████████████████████.  It would, therefore, be entirely reasonable

for the Court to craft a sentence that recognizes the ████████████████████████

███████████████████████████  Neither the Guidelines, nor fundamental principles of

justice, ██████████████████████████████  Thus, requiring Mr. Fakih to remain on

supervised release in his current housing situation, pending deportation to the UK to serve a

probationary sentence, would avoid ████████████████████████████████

████████████████████ and would likely satisfy the need for punishment, based upon his

further deprivation of liberty.

### C.      Sec. 3553(a)(1): The Nature And Circumstances Of The Offense

In addition to the medical and humanitarian reasons set forth above, a significant variance from the Guidelines is warranted.  Mr. Fakih's IEEPA violation, while done intentionally within the meaning of the statute and relevant regulations, was **not** the result of a long-term, premeditated plan involving serial transactions for which he was the mastermind.  To the contrary, the plan to acquire the microwave product at issue was not conceived by Mr. Fakih.  He was an intermediary for a single transaction—the export of a microwave system purportedly for industrial food production and similar uses (the "Industrial Microwave System")—and he did not know that the product was ultimately bound for Iran until late in the process, after the bid for the product had already been placed.   He was also unaware that an industrial or commercial microwave could in any way be weaponized, and neither the Plea Agreement nor the Statement of Offense avers that he was actually aware that it could be weaponized (where IEEPA does not require intent to export a military or weaponizable item for criminal liability—rather, only intent to export U.S.-origin goods to certain countries without a license is required, see 50 U.S.C. §§ 1705(a), (c)).  Nor did he intend, nor could he have ***initially*** intended, to do business with an SDN-listed entity, as ***the SDN listing also did not occur until after the bid***.  He also was unaware of any reason to avoid doing business with Alireza Taghavi (as explained further below) and did not know Alireza Taghavi's client, Jalal Nejad, a.k.a. Jalal Rohollahnejad.

Further, while Mr. Fakih foolishly and regretfully failed to withdraw from participating in the transaction after learning that the end client intended to ultimately ship the product to Iran, ██████████████████████████████████████████████████████████ ███████████████████████.  As explained in further detail below, the scope and motivation

of Mr. Fakih's involvement weigh heavily as mitigating factors for a substantially below-Guidelines sentence.

Mr. Fakih was born in Kuwait, grew up in Kuwait, Kenya and Abu Dhabi, and is a citizen of the United Kingdom, where he has resided since he enrolled at the University of Westminster in London, England in 1995.  (March 7 PIR, ███████  After being laid off in 2003 from his job as a network product support engineer with Nortel Networks, PC in London, Mr. Fakih started his own business in 2004, a company called IPaXiom Communications, Ltd., trading as IPaXiom Networks ("IPaXiom"), in High Wycombe, Buckinghamshire, England.  (March 7 PIR, █████.) IPaXiom focused on providing wireless technologies and internet access solutions, selling equipment and providing associated installation, configuration and support services to telecommunications operators and internet service providers, mostly in Africa, the Middle East, India and Malaysia.

It was in the context of running IPaXiom as a telecommunications vendor and developing business contacts that, in 2005, Mr. Fakih first became acquainted with Alireza Taghavi ("Taghavi"), the principal contact for the purchaser of the Industrial Microwave System at issue.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████.

Furthermore, it is undisputed that it was Taghavi, not Mr. Fakih, who was the impetus behind the bid on the Industrial Microwave System to the Massachusetts Company.  Taghavi approached Mr. Fakih with the proposal that Mr. Fakih act as a broker and place a bid on the Industrial Microwave System on behalf of Taghavi (who, in turn, was acting for an end client, Jalal Nejad, alleged to have the true name Jalal Rohollahnejad ("Nejad"), see March 7 PIR, ██ ██).  Taghavi represented to Mr. Fakih that the Industrial Microwave System was essentially a large microwave oven that would be used to dehydrate pasta, fruit and vegetables for the production of organic snacks, and Mr. Fakih had no reason to know or to believe otherwise, as information he gleaned from the website of the seller (i.e., the Massachusetts Company) and representatives of the seller confirmed that the Industrial Microwave System was for industrial food preparation.  Mr. Fakih also had no knowledge that the Industrial Microwave System could have military applications.  And it was Taghavi who presented the essential details for Mr. Fakih

to place the bid, such as the particular Industrial Microwave System to be exported and the website of the seller for placing the bid.

Moreover, from May to July 23, 2017—the period during which the initial communications and work leading up to the June 5, 2017 bid on the Industrial Microwave System occurred—Mr. Fakih did not believe or have reason to believe that the Industrial Microwave System would ultimately be transported to Iran, as Taghavi had represented to Mr. Fakih that the end client, Nejad ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ), was located in Dubai and would be taking possession of the Industrial Microwave System in Dubai. (Plea, pars. 3, 6; March 7 PIR, █████) It was not until July 23, 2017—when Taghavi sent an email to Mr. Fakih that included a purchase and sale agreement listing Nejad as having an address in Iran—that Mr. Fakih was provided with the first indication that the Industrial Microwave System would be eventually transported to Iran.  In addition, as stated in the indictment, Taghavi's company, Rayan Roshd Afzar, was not placed on the OFAC SDN List until July 18, 2017. (Indictment, ████████  Further, Mr. Fakih was told during this time that Taghavi was operating a company called "Rayan Electronics," not "Rayan Roshd Afzar."  Mr. Fakih therefore did not know and could not have known that Taghavi was associated with an entity on the SDN List.  There is also no allegation that Taghavi, in his individual capacity, or any other individual with whom Mr. Fakih communicated, had been placed on the SDN List at any time.  Accordingly, from May to mid-July 2017—*i.e.*, during the formative stages of Taghavi's proposal to purchase the Industrial Microwave System—Mr. Fakih did not know, and would not have had reason to know, that the Industrial Microwave System would be sent to Iran after being exported to Dubai.  Nor did Mr. Fakih deal with any person or entity subject to blocking under the SDN List up to that point.

Indeed, as noted above, Mr. Fakih did not know of the existence of an entity called Rayan Roshd

Afzar and, therefore, could not have known that an entity that was eventually on the SDN List was

involved in the transaction.

In addition, although Mr. Fakih admittedly knew in October and November 2017 (when

the offense conduct took place) that the Industrial Microwave System would be shipped ultimately

to Iran, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████. After the Industrial Microwave System was prevented from

being exported by U.S. Customs and Border Protection ("CBP") (see PIR, █████), the

Massachusetts Company refused to issue a refund for the Industrial Microwave System.  ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████.

　　　Saber Fakih ████████████████████████████████████████

████████████████████████████████████████████████████████

[redacted]

[redacted]

[redacted].

The facts, then, clearly show that:

- Mr. Fakih was not one of the originators or "masterminds" of the plan to acquire the Industrial Microwave System to send to an ultimate destination in Iran and did not know about the Iranian destination until well after he had already placed the bid for the Industrial Microwave System;

- Mr. Fakih was an intermediary who executed the instructions of Taghavi to place the bid and make certain logistical arrangements, stated differently, nothing more than Taghavi's "useful idiot"[1];

- Mr. Fakih had no reason to believe that he was dealing with entities or persons on the SDN List, as Taghavi's company was not placed on the SDN List until well after the bid had been placed, Mr. Fakih was given another name for Taghavi's company which would not have led Mr. Fakih to know of the SDN List placement in any event, and neither Taghavi nor Nejad was on the SDN List at any time;

- he did not believe and had no reason to believe that the Industrial Microwave System had any use except for food industry or similar applications; and

- his later communications, specifically during the December 24, 2017 to August 2018 period regarding the Industrial Microwave System ███████████ ████████████████████████████████████████████████ ████████████████████████████████████████.

Under these circumstances, a sentence substantially below the Guidelines is clearly warranted, as Mr. Fakih **did not participate in a meaningful way in the formative planning of the offense and, accordingly, did not *initially* intend to export goods to a location in Iran.** In

---

[1] Per Miriam Webster online dictionary, "**useful idiot** *noun*, **plural useful idiots:** a naive or credulous person who can be manipulated or exploited to advance a cause or political agenda" "Useful idiot." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/useful%20idiot. Accessed 20 Jan. 2024.

this regard, the factors relating § 2M5.1 of the Guidelines are relevant, as consideration of those factors are also applicable in the context of a § 3553(a)(1) analysis of the facts and circumstances of the offense.  See United States v. Groos, No. 06 CR 420, 2008 WL 5387852, *6 (N.D. Ill. Dec. 16, 2008) (applying significant downward variance from Guidelines sentence pursuant to § 3553(a)(1) in light of analysis of § 2M5.1 factors in Application Note 2).  In relevant part, Application Note 2 of § 2M5.1 states:

> In determining the sentence within the applicable guideline range, the court may consider the degree to which the violation threatened a security interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences. Where such factors are present in an extreme form, a departure from the guidelines may be warranted.

Applying these factors, the court in Groos concluded that a significant downward adjustment in the sentence was justified.  With regard to the degree to which the violation threatened a security interest of the United States, just as the Groos court found that there was "no evidence that [the defendant's] intent or effect was to subvert national security," id., here, Mr. Fakih had no intent to subvert the United States' national security, as he believed that the Industrial Microwave System was simply for ordinary industrial applications such as food production (in this case, to dehydrate pasta, vegetables and fruits for organic snacks, as Taghavi represented to Mr. Fakih, see March 7 PIR█████████) and had no reason to believe otherwise.  Further, in Groos, the defendant (the president of the company shipping goods to Iran) "made a single decision to violate the embargo" for an existing customer, "[n]or did the transaction require significant planning."  2008 WL 5387852, *4.  Similarly, Mr. Fakih participated in only a single transaction, the attempted export of the Industrial Microwave System from the Massachusetts Company for Taghavi, a person he had known for more than a decade as an ordinary business acquaintance.  Moreover, Mr. Fakih did not engage in any of the initial planning for the idea to export the

Industrial Microwave System for eventual delivery inside Iran, and, indeed, was presented by Taghavi with all the essential details for bidding on the Industrial Microwave System without further research, price negotiation, or other preparatory work.

Thus, the nature and circumstances of the offense under § 3553(a)(1), in light of proper application of the § 2M5.1 factors articulated in Application Note 2, weigh in favor of a significant downward variance from the Guidelines sentencing range.  See also United States v. Houchin, No. 4:07-CR-00025 GTE, 2007 WL 3374595, *3 (E.D. Ark. Nov. 6, 2007) (where defendant sheriff's deputy committed criminal deprivation of constitutional rights that involved no significant planning, downward variance was justified); United States v. Owens, 541 F.Supp.3d 102, 113 (D.D.C. 2021) (in case arising out of the January 6, 2021 Capitol riots, under analogous provisions of the Bail Reform Act which provide for pretrial release of defendants depending on, *inter alia*, "the nature and circumstances of the offense charged," the District of the District of Columbia found that the defendant's conduct was mitigated by lack of preparation or premeditation).

Furthermore, the fact that Mr. Fakih contacted the Massachusetts Company and the freight forwarder between December 24, 2017 and August 2018 ███████████████████████ ██████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████, is yet another set of circumstances of the offense weighing in favor of a downward variance.  As an initial matter, Mr. Fakih's conduct during that period is irrelevant to the elements of the offense to which he has pleaded guilty, as the relevant offense conduct occurred in October and November 2017.  (March 7 PIR, ███)  Furthermore, ████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████.  The policy rationale ████████████

████████████████████████████████████████████████████████

████████████████████ .

### D.      Sec. 3553(a)(1): the history and characteristics of the defendant;

A significant downward variance is also merited by Mr. Fakih's history and characteristics, pursuant to § 3553(a)(1).  As his biographical details show (see March 7 PIR, ¶¶ 60-93), Mr. Fakih is a kind, humble, hardworking man raised in a loving family, who has gone on to raise a loving family himself, and has simply tried his best to provide a decent, and by no means lavish, life. Further, under United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994), his status as a deportable alien also warrants downward variance.

### 1.      Mr. Fakih's Background, Career, and Family Life

Saber Fakih was born on ██████, 1975, in Kuwait City, Kuwait to Altaf Faquih and Tahira Fakih.  Altaf Faquih emigrated to Kuwait from Mumbai, India in the early 1970s in search of economic opportunity and worked in sales, business development, and operations in the telecommunications industry, eventually working his way up to managerial and deputy executive positions.  Tahira Fakih was a stay-at-home mother.  Saber's brother, Bader, was born in 1977.[2] Until 1989, the family lived in Salmiya, Kuwait.  Saber had a generally happy childhood, and along with Bader was provided with the necessities of life and a good education.  The family then moved to Nairobi, Kenya; in their absence, Salmiya was mostly destroyed during the Iraqi invasion of Kuwait.  The family remained in Nairobi until 1993, when they returned to Kuwait and Saber completed his high school education.

---

[2] In this section, Saber Fakih is referred to by his first name, in order to avoid confusion with his brother.

In 1995, Saber enrolled in the University of Westminster, located in London, England, United Kingdom.  The University of Westminster was founded in the 19th century as the Royal Polytechnic Institution, a so-called "polytechnic" school, which in the United Kingdom denoted a class of educational institutions geared towards vocational training in engineering and other similar fields, primarily for local communities rather than the academic elite of the country.  (See "Bring back polytechnics, argues higher education report," Judith Burns, British Broadcasting Corporation (June 10, 2013), attached as Exhibit "B.") (noting that, "[u]nlike universities 'polytechnics tended to serve their local communities and offered more vocational-oriented qualifications, accredited by professional bodies'").   In 1992, as part of a comprehensive educational reform plan, the polytechnic institutions were converted into universities.  (See Exhibit "B.")   However, while former polytechnic institutions offered high-quality educations for affordable tuition, as a general matter and particularly in the early years immediately following the 1992 conversion—when Saber attended the University of Westminster—they did not offer the kind of access to elite social circles associated with traditional universities in the United Kingdom.  Thus, Saber's education was prized by him and his family both as a qualification for obtaining a decent job and as an intrinsically valuable good resulting from application to his studies.  It was not, however, a harbinger of great wealth to come.

During his time at the University of Westminster, Saber lived with a maternal aunt, Munaw-wer Sultana Faki, and her husband, Mohamed Haniff Faki, in London.  She has known and had a close bond with Saber since he was two years old.  Speaking to his character even as a young man, she recounts how, as he pursued his studies, he always prioritized being helpful to and spending time with family, and continued to be an integral part of Ms. Faki's family after they moved from London to Birmingham:

My father-in-law unfortunately passed away a week before Saber came to live with us. Saber was a great help to us during this time, especially to my husband. The atmosphere would be sad at home but he would try to distract us by keeping the atmosphere jolly and giving us courage and support when we needed it. When Saber came to live with my husband and I in London, he very quickly moulded into our small family, he became more of a son to us than my nephew. Every day, Saber would wake up early and have breakfast with me. We would walk for 20 minutes till we reached Kingsbury Train Station, where we would take the same train everyday. His stop would be first and mine would be two or three stops after. The trains would always be very busy but Saber would quickly run in to find a seat for me to sit while he stood next to me.

Somedays he would finish university and reach home before I would. Unlike other students who would roam around campus, Saber would quickly come home and clear up the mess from the morning and make sure the house would look spotless for when I got home from work. Saber never had a habit of staying out of the house late, even when he did go out with his friends he would always make sure he would be home at a reasonable time. He has always been a respectful person, he knew I did not like staying out too late and he used to make sure he followed our house rules. He would always ask us for permission before he went anywhere with his friends, he treated us like his own parents and gave us equal respect.

Saber knew I was afraid of ghosts and was easily frightened so he would always play pranks on me to have a laugh. One incident that stands out in my mind was when we were joking around and talking about ghosts, he ran upstairs and hid in his room. When I went after him and opened his room door, I could not find him. I looked in the cupboard and he wasn't there so then I went to look out of the window and he scared me from behind. He still reminds me about this till today and we have a good laugh remembering it. Saber and I were more like friends, he was always there for me when I needed him.

When my first child was born, he was very attached to her and spent a lot of time with her. He would tell everyone that he now has a little sister. Saber was a big help, especially with babysitting; he'd tell me to go rest while he sat with her and watched football, which he loved. He always made time for her and would never turn down a babysitting job. He got her a doll one day, which she adored so much and never allowed anybody else to touch, she still keeps this doll safe 20 years later.

> Saber is a very kind hearted, generous person who would do everything he could to put a smile on other people's faces. When we moved to Birmingham, we didn't have a TV for a while. Saber knew my husband always wanted a large flat screen TV, so he went and bought one for us and in the school holidays, he came over and set it up for us. Saber has been a big part of both of my daughters lives, they look up to him a lot as an older brother.
>
> Saber is a very fun loving, jolly person who can never stand to hear something bad said about anyone, even if they have hurt him. Despite being well educated he has always struggled with finding a job. However, he has never given up and still believes it's better to keep trying than to give up.

(See Letter of Munaw-wer Sultana Faki, attached to the Certification of Jeffrey M. Kolansky Attaching Character Reference Letters ("Kolansky Cert.") as Exhibit 1.)

Mohamed Haniff Faki similarly describes Saber as dutiful and full of genuine warmth and generosity, helping to uplift Mohamed in the most difficult of times after Mohamed lost his father:

> A week before Saber came to live with us in London, my father had unfortunately passed away. During my mourning period, Saber supported me and was that pillar of strength that I needed in that difficult time. Every evening when I got home from work, Saber would sit with me for as long as I needed, trying to cheer me up and give me the strength I needed to pick myself up and carry on with life like before. Without Saber, I don't think I would have been able to get back up on my feet and be the person I am today. He has always supported me and been more like a son to my wife and I. My mother used to visit and stay the weekend with us every once in a while, Saber had a really good relationship with her. They would sit together for hours talking and watching TV. She would always give him sweets that she hid from me and would tell him not to tell me.
>
> During the time he lived with us, Saber would accompany me to play indoor cricket, a sport in which he had a keen interest in. He also got along with all of my friends, co-workers and even my manager. I eventually managed to find a job for him at the company I worked for, in another branch, where he worked part time whilst studying.
>
> He would also accompany me to the mosque to pray and open our fast during the holy month of Ramadan. Saber would come home from university, clean the house and then prepare food to take to

share with others at the mosque when opening our fasts. I would come straight from work and meet him at the mosque whilst he would bring the food with him on the bus.

We would also visit my late sister quite a lot when Saber was living with us, he never treated them as if they weren't members of his family. He made it a point to maintain the atmosphere he was in lively and enjoyable at all times. Saber, my wife and I would go out sightseeing as a family, once in a while and even go out for dinner occasionally.

Saber has always believed in the importance of family, which is why when he first saw his wife at a wedding we attended, he informed us about her first. We set up a meeting with the family and informed his parents once we approved. Then we all started preparing for the wedding as a family.

Our relationship is more similar to best friends rather than an uncle and nephew. Despite being much younger than me, he has encouraged and continues to encourage me to be the best I can. Another thing I admired a lot about him was that he would always wait for my wife and I to return home after work, to eat dinner together as a family.

At the time of the birth of my first child, Saber stepped in and helped my wife and I alot. He would babysit whenever we needed and always made sure he spent time with her. I believe he has had a great impact on both of my daughter's childhood in a positive way and they look up to him a lot. Although I now live in Birmingham, which is further away from Saber and his family, he still makes time to visit us on a regular basis. His affection for my daughters hasn't changed over the years, and we still spend school holidays together as a family.

Saber is a happy, enthusiastic individual who can't seem to find anything wrong with anyone. Over the years that I have known Saber, he has struggled with finding jobs, despite being well educated and competent. However, he has never let this deter him, and he has always continued to look for work. Saber has never believed in seeking benefits and has always strived to provide for his family by himself.

(See Letter of Mohamed Haniff Faki, attached to the Kolansky Cert. as Exhibit 2.)

After graduating from the University of Westminster with a bachelor's degree in engineering in 1999, Saber took a job as a network product support engineer for a

telecommunications company, Nortel Networks, PLC, in London.  More significantly, in 1999 Saber married Tabassum Nathekar in High Wycombe, England.  In 2001, Saber and Tabassum had a son, Raed, and in 2004 had a daughter, Myesha.  Raed was enrolled at Buckinghamshire New University in Buckinghamshire, England, with a concentration in sports science, and was hoping to begin a career in the sports industry upon graduation, (*e.g.*, as a physiotherapist, coach, or the like); however, due to the family's difficult ██████████ financial circumstances, which have been exacerbated if not in part occasioned by Saber's separation from them, Raed has been unable to complete his education and has had to take a job outside of his anticipated field.  Myiesha recently completed her high school education and had enrolled in a university.  However, █████ ███████████████████████████████████████████, Myiesha had to withdraw from the university and, like Raed, had to take what employment she could find to support the family.  Both children have been raised by Saber and Tabassum continuously, and they currently live with Tabassum while Saber remains on pre-sentence supervised release in the United States.

The relationships between Saber and his family—among others, his parents, his brother Bader, his extended relatives, his wife Tabassum, and his children Raed and Myiesha—are close-knit and mutually supportive.  Saber's parents have described him as "very humble, nice, kind-hearted, and loving," and as always ready to help others in need, even if he does not know them personally.  Having been raised as a devout Muslim, Saber also does not drink or take illicit drugs. (PIR, ██████) Saber keeps in regular contact with his parents as well as his brother, ████████ ████████████████████████████████████████████████████████████████████ ████████.  Saber's parents ████████████████████████████████████████████ ████ his childrens' continued flourishing.

Saber's relationship with Tabassum has been the cornerstone of his life.  As Saber's uncle recounts in the above-quoted excerpt from his letter to the Court, they first met at a wedding. While Saber was still finishing his university education, he and Tabassum met again through family, and before long, they married.  Saber and Tabassum have been together for most of their adult lives, and it has been with Tabassum's unstinting support—both practical and moral—that Saber has negotiated the most critical junctures of his life.  And as Tabassum states, she and Saber "have always been there for each other," and praises him as having always been a good husband.

Saber's love for his children and, together with Tabassum, his unstinting efforts to give them a better life are equally apparent and exemplify the immigrant ethos of hard work and familial devotion.  Myiesha cherishes her close relationship with her father, who is "more like my best friend as I share mostly everything with him," and appreciates not only his guidance and support in her scholastic and extracurricular activities but his emotional support at difficult times— ████ ████████████████████████████████—and humor and joyfulness at others.  Likewise, Raed describes his father as his "rock" who has "always been there" to support him in everything he does and experiences—whether in academics, sport, or other things, great and small, in life. Further, Raed describes ██████████████████████████████████████ ████████████████████████████████.  As summed up by Tabassum, Saber is a hands-on father who is intimately involved in all aspects of his children's lives, and his unconditional love and support for them is reflected by their love for him and distress about his prosecution. During the past two years while unable to see his family in England, Canada or elsewhere, Saber recounts that his day consists of very lengthy internet calls with his wife and children, his parents and his brother, along with his dedicated 5 times daily prayer schedule.

The testimonials of other relatives and friends also consistently show that Saber's entire life has been characterized by kindness, loyalty, conscientiousness, and generosity.  One of his younger cousins, Imaan Hanif Faki (daughter of Munaw-wer Sultana Faki and Mohamed Hanif Faki) looks up to him "a brother figure" who always acted with selflessness and genuine love for her and her family:

> Saber always encouraged my sister and I to be consistent with our prayers and taught us more about our religion. I would always go to ask him any questions I had about our religion. Sometimes, I would ask why many times but he always remained patient and tried his best to explain things to me, in a way that I understood. He would not only encourage me to pray and focus on religion but also encouraged me with eating. I had an eating issue as a child, Saber would sit with me after everyone else had finished their meal and gone to play and encourage me to eat just a little bit more.

> We would go everywhere with Saber and his family, we would go to the beach on the weekends in the summer and spend the day there as a family. I remember one time, he bought my sister and I a pair of sunglasses. We still have these kept in our rooms, although we don't wear them now, we keep them safe from damage as  a memoir of that time.

> We went on holiday, with Saber and his family, to Abu Dhabi to see my aunty (Saber's mum) in 2010. When we were there, I struggled with eating a lot more as it was humid and that affected me more. I remember one time we had gone out to a shopping mall, we had all got food but I didn't like it. Suddenly, I felt really sick and had a pain in my stomach, Saber and his brother ran into McDonalds and asked everybody if they could go ahead and quickly place an order for me. They somehow managed to order the food and ran back to me to give it to me. I still remember the worry on both of their faces for me.

> ████████████████████████. They usually cook food and bring it with them and we all sit together, watch tv and then eat. He has always been there to support us whenever we needed, even if it is last minute or late at night. He really has taken on the responsibility of an older brother to my sister and I, we even call him 'Saber Bhaijhan' which means older brother in Urdu.

During my time at sixth form [the UK equivalent to the 12th grade in the US], I studied BTEC IT. I struggled with understanding one of the units we were learning, so I contacted Saber and told him I was having trouble. I then sent him my assignment brief which he read through to get a better understanding of what I needed to know and do in order to pass. He stopped what he was doing and explained everything that I didn't understand, over the phone. He double-checked that I understood what he was teaching me, and if I didn't, he would attempt to explain it again in a different way that I understood. At first, I thought I would never even get a merit for this specific assignment but after Saber explained everything to me, I managed to attain a distinction.

After I finished sixth form, I knew that I didn't want to go to University and that I wanted to do an apprenticeship. Saber helped me write my CV and prepared me for interviews. He helped me a lot with finding apprenticeships as he knows from experience how hard it can be to find a job. Saber is a very generous, caring individual who would go out of his way to help others around him. He has always wanted the best for my sister and I. He still calls me every few weeks to ask me how I am finding my apprenticeship and asks me if I need any help.

(Letter of Imaan Hanif Faki, attached to the Kolansky Cert. as Exhibit 3.)

Likewise, Imaan's sister, Ilhaam Faki, describes Saber's support and concern for the well-being of her family, ███████████████████████████████████ ██████████████████. (Letter of Ilhaam Faki, attached to the Kolansky Cert as Exhibit 4.)

The numerous testimonials from friends—coworkers, business partners, childhood classmates—also reveal Saber's fundamental nature as a person who, before adulthood, was already mature in character beyond his years, always supportive where it would have been easier to be indifferent, generous with his time and advice, and helping to advance the academic and business careers of others with no expectation of reward. (See Kolansky Cert., Exhibits 5-14.)

Saber's employment history also reflects his conscientiousness in trying to provide for his family, though with uneven success, perhaps due in part to naivete and his tendency to see the best in others. At his first post-university job at Nortel Networks, PLC, Saber received pay increases

and promotions, but only up to a certain point, starting at a salary of US$25,000 and eventually earning approximately US$60,000 before being laid off in 2003 as part of a corporate restructuring. With the pressing need to provide for his young family, Saber took the initiative and in 2004 started his own business, a company called IPaXiom Communications, Ltd., which, as noted above, was a vendor in the telecommunications/internet service provider industry providing products and associated services  While, with hard work, Saber's company saw early successes, after the Great Recession hit global markets in 2007-2008, business declined (where he took a particularly significant loss in 2009 due to a customer's willful failure to pay after Saber had already invested significant amounts of his own money into a project), debts and other losses accumulated, and by May 2013, he had to dissolve the company.

After dissolving his company, Saber worked on projects as a contract consultant, again with mixed results.  From August 2014 to April 2015, Saber worked as a telecommunications consultant for a company called Mobinets on projects in Nairobi and Tripoli, Lebanon.  He was paid a total of approximately US$12,000 over the course of six months, but then he had to terminate the relationship because the company stopped paying him for services rendered.  After that, he worked on odd jobs, such as web design, over the years as he could find them.  The most recent paying work he found was in the period from February to July 2020, when he worked remotely from the United Kingdom as a project management consulting for a company in Edgewater, New Jersey called T3 Infrastructure, LLC.  For a few months, he was paid between $2,000 to $4,000 for this work, but payment ceased due to the COVID-19 pandemic; nevertheless, he continued to provide services for free for a time, in the hopes of building up good will.  The good will, however, was not reciprocated, and that business relationship also ceased.  Since then, with the cloud of the instant case hanging over his head, Saber has been unemployed.  And while

Tabassum's career as a teaching assistant at a primary school is fulfilling to her as a socially meaningful vocation, it is not particularly remunerative.

Thus, while the Fakih family's basic material needs generally have been met, theirs is hardly a life of luxury.  As the March 7 PIR shows (with the proper adjustment for the lower value of one of the family vehicles, as set forth above and in Exhibit "A"), the Fakih household's net worth is approximately ████████, and their monthly income—including modest cash gifts from other family members—is only ████████, an amount exceeded by their monthly expenses for necessities.

Since Saber's and Tabassum's marriage in 1999, their family have lived in ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████ (by ethnicity, persons of Pakistani descent comprise 11.8% of the population; industries in which the most residents are employed include wholesale and retail trade (18.3%), human health and social work activities (10.0%), education (9.7%) and manufacturing (9.0%); and the plurality of occupations held by residents include skilled trades, administrative and secretarial, and associate professional and technical occupations).  From 1999 to 2008, the family lived with Tabassum's parents.  Thereafter, they have lived in a modest three-bedroom house that was purchased by Saber's father, as Saber and Tabassum could not afford it on their own.  Thus, while the Fakih family's life ███████████ is far from being one of glamour or high society, it is generally safe and stable, and for families like the Fakih's, it offers the bonds of a community with shared cultural heritage as well as multi-ethnic diversity.

The family's life has also not been without its challenges, including financial ones, particularly more recently and not only because of the prosecution of Saber. ███████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

In addition, Saber's and Tabassum's children have also been ███████████████

████████████████████████████████████████████████████

█████████████████████████   As noted above, Raed and Myeisha have had to

abandon their university educations ██████████████████████ and take whatever jobs they

could find to provide income for the family.  This obviously has had the effect of reducing their

income potential—as it is widely known that university graduates have higher earnings than those

without higher education degrees—resulting in a vicious cycle in which they cannot complete their university educations due to financial pressures, which results in lower earnings that contribute to financial pressures, and so on.  All these issues which ultimately relate to Saber's absence have also compromised the mental well-being of the entire family.

Other family members are unable to help Tabassum, Raed and Myiesha.  ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████ In Saber's absence, she currently has no other consistent source of support upon whom she can rely for basic needs such as transportation and help in performing daily tasks.  She has also periodically had to be absent from her work ██████████████████████████.

As noted above, ████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████.

In sum, it is clear that Saber Fakih is a man of fundamentally good character, as revealed in both his words and his deeds throughout his life.  In his various business dealings both before and after the offense at issue, he actually lost money, preferring to perform work for free as a gesture of good will, rather than trying to engage in sharp business practices.  Mr. Fakih has simply

sought to make a decent living and instill the same values of decency, conscientiousness, modesty, and kindness in his children that were instilled in him by his parents.

He has never lived ostentatiously, nor, as a devout, practicing Muslim, has he ever consumed alcohol or illicit drugs.  He has always prioritized his family life and true friendships over material or hedonistic considerations.  The detailed, heartfelt correspondence from family and friends consistently and comprehensively depict the portrait of a man who has always put others ahead of himself, befriending and lifting up people who felt isolated and unwelcome, and choosing to devote his time and energies to comforting, assisting, and simply being with his friends and family.  And especially at the moment, his highest priority is to return home so that he can be with his family.  █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

In light of the above—and, moreover, his lack of any criminal history whatsoever (March 7 PIR, █████████)—it is clear that Saber's commission of the offense to which he pleaded guilty was an uncharacteristic mistake, motivated initially by a desire to provide for his family and a naïve trust in a long-time business acquaintance, then later by a combination of misjudgment and fear of physical retaliation by the buyers.

Moreover, it is equally clear that Saber's separation from his family is exacting a heavy toll not only on him but also on his wife and children, who are utterly blameless.  Under recent amendments to the statute governing sentence reductions for "extraordinary and compelling

reasons" and resulting Guidelines amendments, these factors, ██████████████████

██████████████████████████████████████████, would weigh in

favor of supervised release.  Pursuant to the First Step Act of 2018, Pub. L. No. 115-391, § 603(b),

132 Stat. 5194, 5239, which became effective as of November 1, 2023, 18 U.S.C. § 3582(c)(1)(A)

was amended to, among other things, allow defendants to apply for a reduction in a term of

imprisonment and/or supervised release, whereas previously only the Director of the Bureau of

Prisons was authorized to petition a court therefor.  As the Sentencing Commission's commentary

on the amendment notes, Congress passed the First Step Act "for the express purpose, set forth on

the face of the enactment, of '**increasing the use' of sentence reduction motions**…."  USSG

§1B1.13, comment (emphasis added).  In furtherance of these policy objectives, "the First Step

Act put an end [to the Bureau of Prison's] gatekeeping function and allowed individuals to file

motions for sentence reductions…."   Additionally, "courts have found extraordinary and

compelling reasons warranting sentence reductions based on all the factors the Commission

identified in 2007, ████████████████████████████████████████████

██████████████████████████████████."   In other words, the stated policy objectives

behind the First Step Act and the resulting amendments to §1B1.13(b) are to expand and liberalize

the grounds for reductions in sentences.

Of  particular  applicability  to  this  matter, ██████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████ and the resulting impact on the

educations and life prospects of Saber's and Tabassum's children, ███████████████

███████████████, are precisely the kinds of extraordinary and compelling reasons for

supervised release contemplated by amended ████████████████████████

And, to reiterate, given his lack of any criminal history whatsoever (March 7 PIR, ████

████), it is clear that Saber's commission of the offense to which he pleaded guilty was an

uncharacteristic mistake, motivated initially by a desire to provide for his family and a naïve trust

in a long-time business acquaintance, then later by a combination of misjudgment ███████████

█████████████████. It is therefore respectfully submitted that a holistic consideration

of Saber's life history and characteristics pursuant to § 3553(a)(1), including ███████████████

███████████████████████████████████████████████████████,

compels a significant downward variance from the Guidelines sentencing range, including

probation.

### 2.   Mr. Fakih's Status As a Deportable Alien Warrants Downward Variance

As the March 7 PIR states (March 7 PIR, █████), under <u>Smith</u>, 27 F.3d at 655, "a downward

departure may be appropriate where the defendant's status as a deportable alien is likely to cause

a fortuitous increase in the severity of his sentence." As Saber is a deportable alien, a reduction in his sentence from the Guidelines range is therefore warranted.[3]

In <u>Smith</u>, a pre-<u>Booker</u> case, the United States Court of Appeals for the District of Columbia Circuit remanded the case so that the district court could consider the appropriateness of a downward departure with regard to a defendant deportable alien. While the Bureau of Prisons was directed by statute "to assure that prisoners spend part of the last 10% of their sentences (but no more than six months) under conditions—possibly including home confinement—that will 'afford the prisoner a reasonable opportunity to adjust to and prepare for his re-entry into the community'"—*i.e.*, to place prisoners in a Community Corrections Center, colloquially known as a "halfway house"—the Bureau of Prisons' regulations also generally prohibited aliens from being placed in Community Corrections Centers. 27 F.3d at 651 (quoting 18 U.S.C. § 3624(c)). Thus, the defendant's sentence of imprisonment would be objectively harsher than the sentence of an otherwise similarly situation defendant, based solely on his alien status—a circumstance calling for consideration of a downward departure.

The currently applicable Bureau of Prisons regulations also contain a provision against placement of aliens in Community Corrections Centers. <u>See</u> Federal Bureau of Prisons, Program Statement 7310.04, § 10.b (Dec. 16, 1998) ("[i]nmates who are assigned a 'Deportable Alien' Public Safety Factor" "shall not ordinarily participate" in the Community Corrections Center program). Under this provision, then, Mr. Fakih will be ineligible to serve any part of a sentence in a Community Corrections Center, solely because he is a deportable alien. This case therefore presents a paradigmatic scenario for application of a downward variance under <u>Smith</u>, in addition

---

[3] "[T]he considerations animating <u>Smith</u> apply equally to a variance and a departure." <u>United States v. Thomas</u>, 999 F.3d 723, 736 n.6 (D.C. Cir. 2021).

to downward variances on other bases as set forth herein, as Mr. Fakih will suffer an objectively

harsher sentence than would otherwise be the case without that reduction.

**E.      Sec. 3553(a)(2): Sufficiency of the Sentence**

Sec. 3553(a)(2) requires courts to examine:

> the need for the sentence imposed--
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

As shown below, each of these elements, to the extent applicable, weighs in favor of a

substantially below-Guidelines sentence.

**1.      Sec. 3553(a)(2)(A)**

It is respectfully submitted that a sentence below the Guidelines range will promote the

objectives of § 3553(a)(2)(A).  As the Court is "charged with establishing a punishment that is

sufficient, but not greater than necessary, for *this* defendant," <u>United States v. Johnson</u>, 588

F.Supp.2d 997, 1004 (S.D. Iowa 2008) (emphasis in original), rather than for a generic or

hypothetical defendant, consideration of the consequences of Mr. Fakih's guilty plea on his life—

both immediately and in the future—is entirely appropriate, and also weighs in favor of downward

variance.

Simply put, the prosecution of Mr. Fakih's case and his guilty plea have completely

upended his life, even before sentencing.  While he voluntarily came to the United States ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ His

movements are very limited in time and area, and as a consequence, he ventures out from his

██████████████ only to get food compliant with his religious practices (*i.e.*, halal) within a

radius of a few city blocks, while wearing an electronic ankle monitor,. And prior to coming to

the United States, Mr. Fakih also spent six months under house arrest with an electronic ankle

monitoring tag and curfew. In other words, although he has not been in prison, his life, both in the

United Kingdom and the United States, has been far from unfettered.

Furthermore, as a result of his actions and guilty plea, any reputation that Mr. Fakih had as

a businessman has been destroyed. Among the first results from Internet searching of his name is

the U.S. Department of Justice's January 27, 2022 press release touting Mr. Fakih's guilty plea.

Thus, to the extent he had the ability to find even marginal work before his guilty plea, his ability

to find work, particularly relating either to his engineering background or to exports, has been

shattered, certainly in the near term. Any prospective employer or customer will easily find the

press release, which does not simply set forth the facts to which Mr. Fakih pled verbatim, but also

includes the government's public relations gloss on the plea. As such, to a lay reader, the press

release will paint Mr. Fakih as some kind of terrorist mastermind and, particularly for Western

readers, may evoke prejudicial associations with infamous, violent, self-professed Islamic jihadists

due to Mr. Fakih's ethnicity.

For the same reasons, Mr. Fakih's reputation in general will also be destroyed, if it has not

been destroyed already, amongst those who do not already know him well, and he will garner

negative publicity and attention in the United Kingdom and elsewhere. Indeed, others are already

trying to exploit the publicity regarding Mr. Fakih's plea for their own aggrandizement. A

representative of what appears to be an export consultancy has used the Department of Justice press release to advertise his services, stating: "[i]f your compliance system could use a tune-up to help identify and avoid bad actors like Mr. Fakih, then we can help!"  (Export Solutions website, "The United States isn't happy with Saber Fakih," available at https://www.exportsolutionsinc.com/resources/blog/the-united-states-isnt-happy-with-saber-fakih/).  While particularly crass, this exploitative recycling of the press release regarding Mr. Fakih's plea is, unfortunately, a predictable example of some of the deleterious effects of the plea itself.

Moreover, as of the date of filing of this Memorandum, it has been two years and almost six months since Mr. Fakih was severed from his family—unable to support, comfort, guide, and care for them, or to experience the myriad other joys of family life, in the ways that can only be done in person.  While he keeps in touch with them by telephone and video daily, his absence has nevertheless been keenly felt by both him and his family, as they have already stated.

As the United States Supreme Court has stated, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."  Gall, 552 U.S. at 54.  Mr. Fakih, by pleading guilty, has accepted that he must bear the negative consequences of his violation of the law.  The harsh consequences that have been already visited upon Mr. Fakih and his family, and that will continue to accrue, by virtue of his plea alone, are themselves a form of punishment.  Thus, given the real conduct and circumstances in this case, a sentence with a significant downward variance from the Guidelines range will be more than adequate to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

### 2.      Sec. 3553(a)(2)(B)

In determining what sentence will promote adequate deterrence, § 3553(a)(2)(B) states that the deterrent effect of the sentence should be considered.  The two aspects of deterrence are specific deterrence—*i.e.*, the deterrent effect on Mr. Fakih in particular—and general deterrence, *i.e.*, the deterrent effect on society at large.  In light of all the facts, deterrence has already been accomplished.

The above-noted destruction of Mr. Fakih's economic prospects by virtue of his guilty plea and the resulting publicity, as well as the pain caused to his family (including the additional reputational damage and legal jeopardy inflicted on his father and his brother due to their indictments), should be considered adequate specific deterrence.  See United States v. Mizrahi, No. 00-CR-960 (JBW), 2008 WL 3009983, *2 (E.D.N.Y. June 16, 2008) ("[s]pecific deterrence is obtained through the loss of a valuable business and the severe punishment of [defendant's] sister, who was substantially involved in the same scheme").  Furthermore, there is no evidence to suggest that the public must be protected from any further crimes of Mr. Fakih, a non-violent first-time offender with no history of anything even suggesting that he has broad criminal proclivities.  To the contrary, his life history—reflected not only the lack of any criminal record but also the testimonials to his kindness, empathy, propriety, and lack of selfish, mercenary instincts (to his economic detriment)—strongly demonstrates that there is no risk that Mr. Fakih will commit any other crime ever again.  Mr. Fakih is obviously highly motivated to return to, and stay with, his family in the United Kingdom as soon as possible and to never take any opportunity that could even remotely raise the prospect of illegal conduct, for fear of being separated from his family again.  Thus, specific deterrence has already been achieved.

As to general deterrence, there is no good reason to impose a harsher sentence than would otherwise be reasonable in light of the other § 3553(a) factors, based merely on the supposed deterrent effect of a harsher sentence on potential future criminals.  As the District of Columbia Circuit held in a case upholding a sentence of probation and a fine for a tax offense, the government cannot rely upon general deterrence alone as a reason to impose a harsh sentence, as such an argument "elevates one § 3553(a) factor—deterrence—above all others.  As § 3553(a) makes clear, however, the district court at sentencing must consider and balance a number of factors…." United States v. Gardellini, 545 F.3d 1089, 1095 (D.C. Cir. 2008).  The government's argument that general deterrence required a harsher sentence also failed on its own terms, as the defendant's sentence was due to various specific factors, and therefore could not be taken as a reliable predictor of lenient treatment by future offenders. Id.  In addition, empirical research strongly suggests that, especially in white-collar crimes such as this one, the severity of a sentence does not have any additional deterrent effect that is not already obtained by the prospect of conviction itself.  See Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28-29 (2006) ("increases in severity of punishments do not yield significant (if any) marginal deterrent effects," as found by, *inter alia*, "[t]hree National Academy of Sciences panels, all appointed by Republican presidents … [and] every major survey of the evidence"); Anthony N. Doob, Cheryl Marie Webster, Sentence Severity and Crime: Accepting the Null Hypothesis, 30 Crime & Just. 143 (2003) (the body of research shows that "sentence severity has no effect on the level of crime in society").  For these reasons, consideration of § 3553(a)(2)(B) weighs in favor of a significantly below-Guidelines sentence – in this case, probation.

### 3.    Sec. 3553(a)(2)(C)

For essentially the same reasons articulated above with regard to § 3553(a)(2)(B), particularly in the specific deterrence context, the § 3553(a)(2)(C) factor also weighs in favor of a significant variance from the Guidelines, as there is no basis to expect that further punishment is needed to protect the public from Mr. Fakih.  The negative publicity from his guilty plea, in addition to his remorse and inherent sense of ethics and responsibility to his family, will ensure that he will never have the opportunity to engage in any remotely similar illegal conduct (or, indeed, any illegal conduct of any kind) again.  He has never received so much as a speeding ticket prior to his guilty plea in this case, and, among other things, the testimonials from friends and relatives confirm that he is an exemplary family man, colleague, and friend who tragically committed an extremely serious error in judgment.  His only wish is to return to his family in the United Kingdom ███████████████.  Under these circumstances, there is more than ample basis to vary significantly downward from the Guidelines and impose a sentence of probation.

### 4.    Sec. 3553(a)(2)(D)

This factor is essentially irrelevant and, if anything, favors a significant downward variance from the Guidelines.  Mr. Fakih is obviously highly educated, having graduated from a university in the United Kingdom, and possesses considerable specialized technical knowledge and skills (primarily in telecommunications, Internet and related technologies).  Notwithstanding that his job and business prospects are bleak, indeed, in light of his guilty plea as discussed above, his education, general intelligence, and the moral support of his family and friends will enable him to find another way to earn a living.  No education or vocational training available in a correctional facility will be of any rehabilitative use.

**F.      Under § 3553(a)(3), Non-Guidelines Sentences Are Available**

Under § 3553(a)(3), the Court is to examine "the kinds of sentences available."  IEEPA does not prescribe a mandatory minimum sentence.  See 50 U.S.C. § 1705(c).  Accordingly, the kinds of sentences available under § 3553(a)(3) include non-Guidelines sentences, and for the reasons set forth herein, a significant variance from the Guidelines, including probation, is appropriate.

**G.      Sec. 3553(a)(4) Guidelines Range**

Under § 3553(a)(4), the Court is to consider "the kinds of sentence and the sentencing range" under the Guidelines.  As set forth above, pursuant to Amendment 821, given that Mr. Fakih is a zero-point offender, the applicable Guidelines offense level is 21, which is equivalent to a sentencing range of 37-46 months.  As also stipulated, Mr. Fakih reserved the right to request a non-Guidelines sentence, and for all the reasons set forth in this Presentence Memorandum, we respectfully submit that a significantly below-Guidelines sentence of probation is justified.

**H.      Sec. 3553(a)(5): Pertinent Policy Statement Favors Downward Variance**

Under § 3553(a)(5), the Court is to consider "any pertinent policy statement" issued under the Guidelines.  While, per the Plea Agreement, there is no downward departure contemplated from the stipulated Guidelines offense level, the Policy Statement embodied in ███████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████—is, for the reasons explained above, nevertheless relevant to a consideration of downward variance from the Guidelines.  See supra, at __.

**I.      Sec. 3553(a)(6): Significant Downward Variance Is Required To Avoid Unwarranted Sentence Disparity**

Under § 3553(a)(6), the Court is to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Given both the available recent sentencing statistics and publicly available information on sentences entered pursuant to pleas in other IEEPA cases, it is clear that a sentence significantly below the Guidelines range is required to avoid an unwarranted disparity in Mr. Fakih's case.

As an initial matter, based on the statistical distribution of sentences involving the same section of the Guidelines (§ 2M5.1), it is clear that the overwhelming majority of sentences are well below the Guidelines range.  In the District of Columbia, for fiscal years 2015 through 2022, in cases in which the primary applicable section of the Guidelines was § 2M5.1, sentencing zone D was applicable, and the defendant was a non-U.S. citizen with Criminal History Category I (excluding career offenders), 73% of cases resulted in a sentence of **up to** 24 months, with average and median sentence lengths of 13 and 14 months, respectively, and average and median supervised release lengths of 18 and 12 months, respectively.  Moreover, for the case most recently reported to the Sentencing Commission for fiscal year 2022, not only was the sentence length up to 24 months, it was for **probation only.** (See United States Sentencing Commission charts, attached as Exhibit "D.")  Thus, as a baseline—even before the numerous factors specific to Mr. Fakih which call for a downward variance are considered—defendants convicted of an offense involving the application of § 2M5.1 are routinely given sentences that are well below the Guidelines range and, indeed, that include **no term of imprisonment at all**.

When specific examples of other cases involving an IEEPA violation are considered, it becomes even clearer that a sentence considerably below-Guidelines is required to avoid an unwarranted disparity.  Here, Groos again is instructive, as it shows that even more blameworthy defendants with far greater resources, and who have suffered far fewer consequences than Mr.

Fakih as a result of a guilty plea, have received sentences well below the Guidelines range.  The Groos defendant was the president of a large, multinational manufacturing company who dealt directly with an Iranian customer with knowledge from the beginning that the destination of goods was Iran, and who been warned by colleagues that the transaction at issue was prohibited by a trade embargo.  2008 WL 5387852, *1.  Notwithstanding those facts as well as others—including, inter alia, the fact that he continued to be employed in an executive capacity by the company, drawing a $250,000 salary, and thus could not credibly claim having been punished economically by virtue of the guilty plea alone, id., *9—after pleading guilty to four counts of IEEPA violations, the defendant was ultimately sentenced to just 60 **days** of imprisonment and one year of supervised release.

Recent IEEPA cases further illustrate the appropriateness of a sentence well below the Guidelines range, including sentences involving no term of imprisonment.  While the specifics of many of these cases are not publicly available, a common thread among cases involving no jail time, and also a factor present here, is that the exported items were not inherently dangerous.  See e.g. United States v. IC Link Industries Inc, 1:17-CR00236 (N.D. Ohio 2020) (the defendant caused pneumatic valves to be shipped to Iran without having a clear indication or knowledge of the ultimate end customer(s)); USA v. Rokhnejad, 3:13-CR-03317 (S.D. Cal. 2014) (defendant exported aircraft engines); USA v. Miller, et al, 1:02-CR-01117 (N.D. Ill 2005) (defendant exported polygraph machines, accepted responsibility, and had no criminal record); USA v. XIE, 1:11-CR-00608 (D.N.J. 2013) (defendant exported amplifiers and related equipment); USA v. Zhang, 2:08-CR-00935 (C.D. Cal. 2010) (defendant exported infrared thermal imaging camera); USA v. Ghashim, 4:06-CR-00283 (S.D. Tex. 2008) (defendant exported computer equipment);

USA v. Carrington, 5:05-CR-00257 (E.D.N.C. 2006) (defendant exported fingerprint analyzer and accepted responsibility).

Most notably, the mitigating factors in this case are substantially similar to the factors in ██████████████████████████████████████████████████ USA v. Singh, 1:10-CR-00093 (D. Del. 2011), █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████.

In Singh, the defendant's sentencing memorandum noted that he exported digital microwave radios that were not intrinsically dangerous, had no criminal record, no knowledge of any wrongful, intended purpose for the radios, and accepted full responsibility for his actions. The memorandum also emphasized that he is the sole provider for his family by running a one-man business to support his wife and their two young children, and that incarceration would likely both lead to his deportation and cause his business to fail. The memorandum included various letters

from family and friends testifying to his remorse and the profound impact that incarceration would have on his family.   The government's sentencing memorandum largely agreed with the Defendant, recommending 18 months jail time because the radios were not inherently dangerous and the defendant admitted guilt almost immediately.   At the sentencing hearing, the judge noted the heavy social price of being labeled as a convicted felon, and due to the significant chance of deportation and the resulting effects on the defendant's family and business, the lack of any danger to the community, and the defendant's whole-hearted acceptance of responsibility and remorse, the judge imposed a sentence of three years' probation, with six months home confinement, and a fine of $100,000.



Here, Mr. Fakih shares many characteristics of the defendants in ████ and <u>Singh</u>.  He has fully accepted responsibility for his action, including voluntarily entering into the United States without an extradition hearing.   He is a deportable alien, has no criminal record and a nonexistent risk of reoffending, and *he lacked any knowledge of a nefarious purpose behind the microwave equipment*.  Friends and family have come forward with copious testimony regarding his good

character, remorse, and otherwise exemplary conduct.  Further, like the defendants in ████ and

<u>Singh</u>, incarceration would have a profound effect on Mr. Fakih's wife and two children,

████████████████████████████████████████████████████

████████████████████



In addition to the similarities with the defendants in ████ and <u>Singh</u>, which already

indicate that Mr. Fakih should receive a commensurate sentence of probation in order to avoid

sentencing disparities, ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

It is therefore clear that a significantly below-Guidelines sentence—including a sentence

that does not impose a term of imprisonment—is warranted in order to avoid an unwarranted

sentencing disparity.

> **J.      Under § 3553(a)(7), There Is No Need to provide restitution to any victims of the offense**

Under § 3553(a)(7), there is no restitution to any victims that need be considered.  As set

forth in the PIR, "[t]here are no identifiable victims for this Count of conviction."  (PIR, ███.)

Indeed, the only persons who, to Mr. Fakih's knowledge, lost any money in connection with the

attempted exportation of the Industrial Microwave System were Taghavi and/or Nejad—the

persons who actually conceived and initiated the exportation plan.

### K.        No Fine Should Be Imposed

In relevant part, 18 U.S.C. § 3572 sets forth factors for consideration of whether to impose

a fine as follows:

> (a) Factors to be considered. --In determining whether to impose a
> fine, and the amount, time for payment, and method of payment of
> a fine, the court shall consider, in addition to the factors set forth in
> section 3553(a)--
>
> (1) the defendant's income, earning capacity, and financial
> resources;
>
> (2) the burden that the fine will impose upon the defendant, any
> person who is financially dependent on the defendant, or any other
> person (including a government) that would be responsible for the
> welfare of any person financially dependent on the defendant,
> relative to the burden that alternative punishments would impose;
>
> (3) any pecuniary loss inflicted upon others as a result of the
> offense;
>
> (4) whether restitution is ordered or made and the amount of such
> restitution;
>
> (5) the need to deprive the defendant of illegally obtained gains
> from the offense[.]

In light of all the facts, it is clear that the balance of factors weighs heavily against the

imposition of any fine.  As documented above and in the PIR (with the additions and corrections

referenced above and in the objections to the PIR, see Exhibit "A"), Mr. Fakih has few financial

resources.  Among other things: he is unemployed, he has been marginally employed with little

income for several years, his employment prospects after his guilty plea are also dim, his household

has a net worth of ▮▮▮▮▮▮ (where his wife is an income earner in a socially admirable but low-

paying teaching assistant job), and his household's monthly net cash flow is negative, despite their

household expenses being limited to essentials, without any extravagant luxuries.  Thus, it is clear

that Mr. Fakih's (lack of) income, earning capacity, and financial resources, and the burden that a fine will impose on Mr. Fakih and his family, weigh against a fine under factors (1) and (2).

Furthermore, factors (3), (4), and (5) of § 3572 are irrelevant. As noted in the PIR, "[t]here are no identifiable victims for this Count of conviction" (PIR, ███); thus, there was no pecuniary loss inflicted upon others as a result of the offense. Similarly, as set forth above and for essentially the same reasons, there is no restitution to be made. And ultimately Mr. Fakih did not illegally retain any gains from the offense.

Moreover, § 5E1.2(a) of the Guidelines states that "[t]he court shall impose a fine in all cases, **except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.**" U.S.S.G. § 5E1.2(a) (emphasis added). Given that, as summarized in the PIR, "it does not appear the defendant has the ability to pay a fine in this case" (PIR, ███), all the relevant factors weigh conclusively against the imposition of a fine.

### L. Probation Can Be Served In The United Kingdom

Finally, it is respectfully submitted that a sentence of probation is manifestly appropriate, as Mr. Fakih can serve a sentence of probation in his home country of the United Kingdom, where his family has been located for more than two decades and continues to reside, █████████ ██████████████████████████████████████████████████████ ██████████████████████.

First, the provisions of the United States Code pertaining to probation expressly permit courts to order deportation as a condition of a sentence of probation. Pursuant to 18 U.S.C. §3563(b)(21):

> The court may provide, as further conditions of a sentence of probation, to the extent that such conditions are reasonably related to the factors set forth in section 3553(a)(1) and (a)(2) and to the extent that such conditions involve only such deprivations of

> liberty or property as are reasonably necessary for the purposes
> indicated in section 3553(a)(2), that the defendant—
>
>                 ***
>
>     (21) be ordered deported by a United States district court,
> or United States magistrate judge, pursuant to a stipulation entered
> into by the defendant and the United States under section 238(d)(5)
> of the Immigration and Nationality Act, except that, in the absence
> of a stipulation, the United States district court or a United States
> magistrate judge, may order deportation as a condition of
> probation, if, after notice and hearing pursuant to such section, the
> Attorney General demonstrates by clear and convincing evidence
> that the alien is deportable[.]

In this case, 18 U.S.C. §3563(b)(21) is squarely applicable, as Mr. Fakih entered into a section 238(d)(5) stipulation that he was deportable, as set forth in Section 12 of the Plea Agreement (a factor also weighing in favor of a downward departure under Smith, 27 F.3d 649, as explained above).  This Court would therefore be well within its authority to order deportation as a condition of probation, which Mr. Fakih acknowledges will result in barring him from reentry into the United States for at least ten years, if not longer, under the Immigration and Nationality Act and 22 C.F.R. § 40.91(b) in particular.

In the alternative, it is respectfully submitted that probation can (also) be served under supervision, pursuant to a multilateral treaty and its implementing statute and regulations.  The United States and the United Kingdom are parties to the Council of Europe Convention on the Transfer of Sentenced Persons (the "COE Convention"), which provides for the transfer of a criminal defendant from a foreign country in which he or she has been sentenced to his or her home country to serve the sentence, regardless of whether it is a term of incarceration or probation.  The provisions implementing the COE Convention in the United States are set forth in 18 U.S.C. § 4100 *et seq.*   In brief, the COE Convention process requires coordination between the Department of Justice, Criminal Division Office of International Affairs and the receiving country

(in this case, the United Kingdom's Foreign, Commonwealth, and Development Office, in coordination with the United Kingdom's consulate in the United States). In addition to the consent of the sentencing country, the receiving country, and the defendant, the other primary requirement for transfer is that the offense for which the sentence is imposed must also be recognized as a crime in the receiving (*i.e.*, home) country. That requirement is met in this case, as the United Kingdom has made the export to Iran of so-called "dual use goods"—which the Industrial Microwave System is alleged to have been—a criminal offense under the Export Control Order of 2008 and Retained Council Regulation (EC) 428/2009.

Thus, while obtaining the requisite approvals from the United States and the United Kingdom and coordinating the particulars of Mr. Fakih's transfer would require some time, it is respectfully submitted that the Court has the authority to enter a sentence of probation which takes these logistical issues into account. Indeed, courts have recognized that a sentence of probation may be served abroad. See United States v. Pugliese, 960 F.2d 913, 915 (10th Cir. 1992) (finding "no direct [legal] impediment" to authorizing a person on supervised release to live abroad).

For these reasons, it is respectfully submitted that this Court can and should enter a sentence of probation to be served by Mr. Fakih in the United Kingdom.

## V.     CONCLUSION

For the reasons set forth above, Defendant, Saber Fakih, respectfully requests that this Honorable Court enter a sentence that is significantly below the Guidelines range, including a sentence that does not impose a term of imprisonment.

Dated:  January 24, 2024

/s/ Jeffrey M. Kolansky
Jeffrey M. Kolansky
PA Attorney ID# 27453
Archer & Greiner, P.C.
Three Logan Square, Suite 3500 1717 Arch Street
Philadelphia, PA 19103
Phone: 215-963-3300
Fax:     215-963-9999
Email: jkolansky@archerlaw.com
*Attorney for Defendant, Saber Fakih*

228360347 v1